2026 Tex. Bus. 45



**The Business Court of Texas,**
**Third Division**

SRI SHIRDI SAI BABA TEMPLE
OF AUSTIN, et al.,
    *Plaintiffs*,

v.

SHIVA LAM, et al.,
    *Defendants*.

§
§
§
§
§
§
§
§
§

Cause No. 25-BC03A-0020

## Memorandum Opinion & Order on Motions for Summary Judgment

¶1     Before the Court are Plaintiffs' Amended Traditional Motion for Summary Judgment (Plaintiffs' MSJ) and Defendants' Traditional Motion for Summary Judgment as to Claims Asserted by Plaintiff Individuals (Defendants' MSJ). In addition to the exhibits to these motions, the parties have filed a Joint List of Stipulated Facts (SF) and the Joint Exhibits (JX). The Court **DENIES** Plaintiffs' MSJ and **GRANTS** Defendants' MSJ.

### Introduction

¶2     This is a dispute over the corporate governance of Sri Shirdi Sai Baba Temple of Austin (the Temple), a Texas nonprofit corporation operating as a

religious institution.[1] The question is: what happens when a nonprofit corporation's certificate of formation says that it is a board-managed corporation with no members but its bylaws say that it has members and is member-managed? The Business Organizations Code provides a clear and simple answer: to the extent there is a conflict between the certificate of formation and the bylaws, the certificate of formation controls. The Court thus holds that the Temple's certificate of formation controls over the provisions of the Temple's 2025 Bylaws purporting to shift corporate management from its board of directors to its trustee-members.

### Background

¶3    **The Original Governing Documents.** When the Temple was founded in 2007, it filed a certificate of formation with the Texas Secretary of State (the Certificate of Formation) and adopted bylaws (the 2007 Bylaws).[2] The Certificate of Formation vests management of the Temple in its board of directors and states that the Temple "will have no members."[3] Consistently, the 2007 Bylaws provide

---

[1] SF 1–3; JX 1.

[2] JX 1–2.

[3] JX 1.

for a board of directors and place management of the Temple in the board's hands.[4] Under these bylaws, new directors are determined by a vote of the board.[5]

¶4 **The Trustees.** In 2015, the Temple established a board of trustees.[6] Although there is a document entitled "Bylaws of Sri Shirdi Sai Baba Temple of Austin Board of Trustees,"[7] the Certificate of Formation and 2007 Bylaws do not contemplate a board of trustees or vest any power in such a board. The Temple appears to have understood that the trustees were there to assist the board of directors, which remained the Temple's governing body for business purposes.[8]

¶5 **The 2024 Board.** In 2024, the Temple's prior directors resigned in the wake of a fraudulent donation-matching scheme discovered at the Temple.[9] The Temple got a new board of directors (the 2024 Board) made up of the Defendants in this lawsuit: Shiva Lam, Raj Gadde, Pammy Razdan, Narayana Koduri, and Ravi Orugunty.[10] Plaintiffs and Defendants agree that the 2024 Board was intended to

---

[4] JX 2. The 2007 Bylaws contemplate the possibility of members, "as provided for in the Articles of Incorporation" and "[s]ubject to the provisions of the Articles of Incorporation." *Id.* The Texas Business Organizations Code provides that "articles of incorporation" and "certificate of formation" may be used synonymously." TEX. BUS. ORGS. CODE § 1.006(1).

[5] JX 2.

[6] SF 6; JX 3.

[7] JX 4.

[8] JX 3.

[9] SF 7; Second Am. Pet. at ¶ 25; Defs. MSJ Exhibit C (Lam Aff.) at ¶¶ 6–8.

[10] SF 7–10; JX 8; JX 32. Lam, Gadde, Razdan, and Koduri were appointed to the 2024 Board by the prior board. SF 7. Orugunty joined the 2024 Board when another appointee resigned. SF 8-9.

convert the Temple from a board-managed corporation to a member-managed corporation, with the managing members being the Temple's trustees.

¶6 **The Investigation of the Donation-Matching Scheme.** One of the first things the 2024 Board did was order an audit of the Temple's finances in connection with the previously discovered donation-matching scheme.[11] The audit took longer than expected, purportedly due to a lack of cooperation from those under investigation.[12] The 2024 Board received the audit results in June 2025.[13] Defendants assert that the auditor determined that certain Temple devotees likely participated in the donation-matching scheme.[14] The Board unanimously voted to prohibit Temple members involved in the fraudulent donation scheme from having voting rights or serving as a director of the Temple for the next four elections.[15] This gave rise to a dispute over who could be a candidate in the upcoming board election, as some candidates—Plaintiffs Mahender Reddy and Lakshmi Kondubhatla—were purportedly involved in the donations scheme.

---

[11] Lam Aff. at ¶ 9.

[12] Lam Aff. at ¶ 13; Defs. MSJ Exhibit D (Gadde Decl.) at ¶ 11.

[13] Lam Aff. at ¶ 14; Gadde Decl. at ¶ 12.

[14] Lam Aff. at ¶ 15; Gadde Decl. at ¶ 12.

[15] Lam Aff. at ¶¶ 14–16.

¶7    **The 2025 Bylaws.** On July 13, 2025, the 2024 Board adopted amended and restated bylaws (the 2025 Bylaws).[16] Unlike the 2007 Bylaws, the 2025 Bylaws contained extensive provisions regarding the Temple's General Body of Trustees (GBT).[17] Under the 2025 Bylaws, "[t]he GBT will be the body of members that are the owners of record of the temple,"[18] and any devotee who is over 18, in good standing, and resides in the greater Austin area can become a trustee by donating a specific amount to the Temple: a one-time membership fee of $20,000.[19] Devotees may also make lesser donations to become patrons (but not trustees), making them eligible to serve on various committees.[20]

¶8    The 2025 Bylaws state: "The overall governance of the Corporation is vested in GBT, which may delegate or withdraw powers from time to time to the [board of directors] as the representatives of the GBT. The [GBT] will be responsible for the long term operation of the [Temple]." It also purports to give the GBT the power to elect the board of directors, remove board members, and reverse board decisions, among other things.[21] In short, the 2025 Bylaws purport to convert the

---

[16] SF 12–13; JX 9–10.

[17] JX 10.

[18] *Id.* at § 2.1.

[19] *Id.* at § 2.2 & Appx. A.

[20] *Id.* at Appx. A. Appendix A also provides for up to 20 honorary patrons. *Id.*

[21] *Id.* at Arts. 3–5.

Temple from a board-managed corporation to a member-managed corporation with the trustees as the corporation's members—as intended by all parties in this case.

¶9     The 2025 Bylaws appear to have been drafted by non-attorney Temple members.[22] The Temple had an attorney at this time, Michael Burg, but he does not appear to have participated in drafting the 2025 Bylaws.[23] Defendants assert that Burg's involvement with the Temple during this period was limited due to family health issues that ultimately resulted in him resigning in October.[24]

¶10    On the same day it adopted the 2025 Bylaws, the 2024 Board sent an email to the trustees informing them of the bylaws' adoption (and other matters) and identifying three "Next Steps":

> • Communication to Mike Burg about recent developments
>
> • Mike B. will be asked to file the necessary paperwork to convert the temple into a **member-based organization**.
>
> • We are also in the process of securing appropriate insurance coverage for all members and trustees. A request to the insurance provider has been sent and we will be following up with them.[25]

¶11    A few weeks later, Burg wrote a letter to the trustees, outlining the rights, duties, and liabilities they would have under the Business Organizations

---

[22] Lam Aff. at ¶ 19.

[23] *Id.*; JX 9.

[24] Lam Aff. at ¶¶ 17, 19, 25.

[25] JX 9 (emphasis in original).

Code as the members of a member-managed corporation, stating: "As the Temple moves forward to becoming a member-based organization; it is important to understand your rights, duties and liabilities as Trustees and members of this organization."[26] The letter concludes: "The Board is currently working with insurance providers to get liability insurance, following which the necessary documents shall be filed with the Secretary of State to convert the Temple to a member-based organization after which your organization can hold elections for a new Board and [Executive Committee]."[27]

¶12 **The Disputed Election.** In September 2025, the 2024 Board established a five-member election committee to oversee an election by the trustees of a new board of directors and executive committee, which was planned for November 15, 2025.[28] The election committee consisted of Raja Babu, Rupa Govindarajan, James Kandasamy, Tapati Parvataneni, and Ravi Mayavaram.[29] The dispute over candidate eligibility continued, including among the election committee. This led the 2024 Board to retain an attorney, Russell Sloan, to advise on candidate eligibility and how to properly conduct the election.[30]

---

[26] JX 11.

[27] *Id.*

[28] SF 14.

[29] SF 15.

[30] SF 16–17; Lam Aff. at ¶ 26.

¶13    After reviewing the Temple's corporate documents, Sloan advised the 2024 Board and the rest of the Temple that the 2025 Bylaws were not effective because they conflicted with the Certificate of Formation, which placed management power in the board of directors and stipulated that the Temple would have no members.[31] He recommended that the election be delayed three weeks (until December 6) to allow the 2024 Board to file an amended Certificate of Formation and adopt new amended bylaws converting the Temple to a member-managed corporation so that the election would be valid.[32] He proposed this timeline:

| Anticipated Dates | Actions |
| --- | --- |
| November 1-2 | Meeting w/ Board, Executives, and Election + Bylaws Committee |
| November 7-8 | Initial draft of bylaws sent to Board |
| November 8-12 | Board meeting to review initial draft and propose changes |
| November 14 | Final draft of bylaws sent to Board |
| November 14-17 | Board meeting to adopt bylaws and establish membership |
| November 17-18 | Filing Amendment to the Certificate of Formation with Sec. of State |
| November 20-21 | Board meeting to approve procedures for the election meeting |
| November 22 | Notices sent to Members for the election meeting |
| December 6 | First meeting of the Members; Elections |

[33]

¶14    On October 27, the 2024 Board held a board meeting at which Sloan presented his legal assessment.[34] The 2024 Board then unanimously voted to revoke

---

[31] JX 12–14; *see also* SF 18–19.

[32] JX 13–14.

[33] JX 14.

[34] JX 13; *see also* SF 18.

the 2025 Bylaws and reinstate the 2007 Bylaws until new bylaws could be approved.[35] The 2024 Board scheduled another meeting for a few days later, November 1, at which Sloan presented his proposals for new bylaws and a short delay of the election.[36]

¶15    The dispute over candidate eligibility burgeoned into a dispute over whether to delay the election. The candidate faction that wanted to move forward with the election dubbed themselves "Team Trust" and created a website with their supported slate of candidates, which included the two candidates whose eligibility was disputed: Plaintiffs Lakshmi Kondubhatla and Mahender Reddy.[37] Two members of the election committee, Raja Babu and James Kandasamy, sided with Team Trust and pushed to hold the election on November 8 despite Sloan's advice that the election would not be valid.[38] The election committee's other three members—Rupa Govindarajan, Tapati Parvataneni, and Ravi Mayavaram—preferred following Sloan's recommendation; they ultimately resigned from the committee over concerns about Babu and Kandasamy's efforts to push forward with

---

[35] JX 13.

[36] *Id.*; SF 21.

[37] SF 20; Lam Aff. at ¶¶ 15–16, 24; Gadde Decl. at ¶¶ 12–13, 26.

[38] JX 20–24; SF 24–25.

the election.[39] With only two members of the committee remaining, the 2024 Board voted to terminate the election committee.[40]

¶16   Despite the objections of legal counsel, the 2024 Board, and three of the five members of the (now terminated) election committee, Babu and Kandasamy moved forward with their plans to conduct an election on November 8.[41] The Team Trust candidates supported this, but other candidates objected to being included on the ballot.[42] On November 8, 2025, Babu and Kandasamy, purporting to act as the election committee, invited the Temple's trustees to vote in an election by email ballot between November 8 and 10 (the Disputed Election).[43] The same day, the president of the Temple's executive committee, Ravi Burujula, sent an email to the Temple's members stating that the election was unauthorized, invalid, and contrary to legal advice, and encouraging members not to participate in the election.[44]

¶17   On November 11, Babu and Kandasamy sent an email announcing the results of the Disputed Election, identifying Mahender Reddy, Lakshmi Kondubhatla, Vijay Joglekar, Praveen Rapolu, Raghavendra Setty, and Venkat

---

[39] JX 16; SF 22.

[40] JX 17; SF 23.

[41] JX18–24; SF 25.

[42] SF 27, 31; Lam Aff. at ¶¶ 35–36.

[43] JX 20.

[44] Defs. MSJ Exh. D–4.

Ambati as the newly elected board of directors (the Plaintiff Board).[45] Three of these individuals—Reddy, Kondubhatla, and Ambati—are Plaintiffs in this lawsuit.[46] Babu and Kandasamy represented in the email that they had "a Trustee voter list of 144" and that 76 trustees participated in the election.[47] If this is accurate,[48] nearly half the Temple's trustees did not participate in the Disputed Election.

¶18 Meanwhile, the 2024 Board moved forward with plans to amend the Certificate of Formation and enact new bylaws, scheduling a meeting for that purpose on November 21, 2025, with an election to follow on December 6.[49] Sloan announced this plan to the Temple's members at a meeting on November 16.[50] The next day, the Plaintiff Board hired legal counsel to file an amended certificate of formation and this lawsuit, both of which were filed the following day.[51] The Plaintiff Board notified the 2024 Board of the lawsuit on November 20—the day

---

[45] SF 27; JX 25.

[46] The fourth individual Plaintiff is Subba Kondubhatla, who is a member of the Temple but was not a candidate in the Disputed Election. *See* Second Am. Pet. at ¶ 9.

[47] JX 25.

[48] Defendants point out that Plaintiffs have admitted in Court filings that there are 143 trustees. *See, e.g.*, Second Am. Pet. at ¶¶ 1, 59.

[49] SF 32; Lam Aff. at ¶ 37.

[50] SF 32.

[51] SF 33–34.

before the 2024 Board's planned board meeting to amend the certificate and enact new bylaws.[52]

**Plaintiffs' MSJ**

¶19　Plaintiffs seek summary judgment declaring that the 2025 Bylaws are the Temple's valid, governing bylaws under Texas law. They argue that this result is required by the Business Organizations Code, the church-autonomy doctrine, and general principles of equity. The Court disagrees.

**A.　With respect to the Temple's corporate governance, the Certificate of Formation controls over the conflicting provisions of the 2025 Bylaws.**

¶20　As detailed below, the Court applies neutral principles of Texas corporate law and concludes that the provision of the 2025 Bylaws purporting to place corporate governance in hands of the trustee-members, rather than the board of directors, directly conflict with the Temple's elections in its Certificate of Formation, and the certificate controls over the conflicting provisions of the bylaws.

**1. There is a conflict between the Temple's Certificate of Formation and provisions of the 2025 Bylaws.**

¶21　All parties agree that the Certificate of Formation vests management of the Temple in its board of directors and states that the Temple "will have no members."[53] These are both very straightforward, check-box options on the

---

[52] *Id.*; Lam. Aff. at ¶ 37.

[53] JX 1.

certificate of formation form.[54] The Temple checked the box for a board-managed nonprofit corporation instead of a member-managed nonprofit corporation:

> **Article 3 – Management**
>
> ☐ The management of the affairs of the corporation is to be vested in the nonprofit corporation's members.
>
> **OR**
>
> ☑ The management of the affairs of the corporation is vested in the board of directors. The number of directors constituting the initial board of directors and the names and addresses of the persons who are to serve as directors until the first annual meeting of members or until their successors are elected and qualified are as follows:

[55]

Likewise, the Temple checked the box indicating that it would not have members instead of the box indicating that it would have members:

> **Article 4 – Members**
>
> ☐ The nonprofit corporation shall have members.
> ☑ The nonprofit corporation will have no members.

[56]

¶22 Defendants argue that these provisions directly conflict with the provisions of the 2025 Bylaws that purport to place corporate management of the Temple in the hands of the GBT, the Temple's members.[57] The Court agrees.

¶23 Relying on the church-autonomy doctrine and general principles of equity, Plaintiffs argue that the 2025 Bylaws were effective to convert the Temple

---

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] JX 10.

13

to a member-managed organization, with the trustees as its managing members.[58]

Those arguments are addressed below. However, somewhat inconsistently, Plaintiffs also argue that the 2025 Bylaws do not conflict with the Certificate of Formation because they do not convert the Temple to a member-managed corporation but rather, "continue to vest the management of the Temple in the board of directors," and the board merely elected to delegate certain authority to the GBT.[59]

¶24    Plaintiffs are correct that the Business Organization Code "allows the board of directors' authority to be delegated," and the 2024 Board could have delegated its authority to the trustees.[60] But that is not what they did. Rather than retaining corporate management in the board and delegating such power *from the board of directors to the GBT*, the 2025 Bylaws purport to vest original management power in the GBT and authorize delegation of authority *from the GBT to the board*: "The overall governance of the [Temple] is vested in GBT, which may delegate or withdraw powers from time to time to the [board of directors] as representatives of

---

[58] Plfs. MSJ at ¶¶ 21–40.

[59] Plfs. MSJ at ¶ 43.

[60] Plfs. MSJ at ¶ 44 (citing TEX. BUS. ORGS. CODE § 22.218(a)(1) ("The certificate of formation or bylaws of the corporation … may designate one or more committees to have and exercise all, or a specified portion, of the authority of the board of directors of the corporation in management of the corporation.")).

the GBT."[61] Even then, the powers delegated to the board under the 2025 Bylaws are expressly at the discretion of the GBT to grant or withdraw at will, and the GBT has explicit authority to override the board's decisions.[62] In short, the 2025 Bylaws purport to do exactly what everyone intended them to do: convert the Temple from a board-managed corporation with no members to a member-managed corporation with the trustees as the managing members.[63] In fact, in contravention of their delegation argument, Plaintiffs expressly plead that the 2025 Bylaws *did* convert the Temple into a member-managed nonprofit corporation.[64]

¶25 There is a direct conflict between the 2025 Bylaws' purported conversion of the Temple to a member-managed corporation and the Certificate of Formation, which identifies the Temple as a board-managed corporation that has no members.

### 2. Where there is a conflict, a certificate of formation controls over bylaws.

¶26 Section 22.102 of the Business Organization Code, which governs a nonprofit corporation's bylaws, dictates that the bylaws may only contain

---

[61] JX 10.

[62] *Id.*

[63] *Id.*

[64] Second Am. Pet. at ¶ 6; *see also id.* at ¶¶ 48, 56. They also plead that the 2024 Board promised to convert the Temple to a member-based organization and is bound by that promise and that it is the will of the trustees that the Temple become a "member-managed organization." *Id.* at ¶¶ 45, 47, 59; *see also id.* at ¶¶ 64, 67, 75, 77. Plaintiffs took the same position in their discovery responses, including repeatedly admitting that "the 2025 Bylaws were intended to establish a governance structure under which Trustees functioned as members." Defs. Resp. Exh. P–1 at 7–10.

provisions that are "consistent with law *and the certificate of formation.*"[65] In an abundance of clarity, the Code further specifies that when bylaws erroneously include a provision that conflicts with the certificate of formation, the certificate of formation trumps: "A provision of a certificate of formation of a corporation that is inconsistent with a bylaw controls over the bylaw, except as provided by Subsection (b)."[66] The exception in Subsection (b) relates to changes in the number of directors and is not implicated here.[67] Here, then, the Temple's board-management selection in its Certificate of Formation trumped the 2025 Bylaws' member-management provisions.[68] No party contends that the Certificate of Formation was amended to resolve this conflict at any time before the day this lawsuit was filed. Thus, the 2025 Bylaws were not effective to shift corporate management of the Temple from the board of directors to the GBT.

¶27 Plaintiffs argue that construing Section 22.103 to mean what it plainly says is "absurd and unworkable," asserting that "an 18-year-old certificate of formation is not intended to be an obstacle" to a nonprofit corporation's

---

[65] TEX. BUS. ORGS. CODE § 22.102(b) (emphasis added).

[66] *Id.* § 22.103(a).

[67] *See id.* § 22.103(b) ("A change in the number of directors by amendment to the bylaws controls over the number stated in the certificate of formation, unless the certificate of formation provides that a change in the number of directors may be made only by amendment to the certificate.").

[68] *Id.* § 22.103; *see also id.* § 3.009 (requiring certificate of formation for nonprofit corporation to state if it is to have no members or if it is to be member managed).

intentions.[69] The Court agrees that certificates of formation are not intended to be obstacles to a corporation's effectuation of its desired management structure, but disagrees that the statute has that effect. Section 22.103 simply resolves a foreseeable problem (an unintentional conflict in a corporation's governing documents) with a clear answer (specifying which document controls in that event), giving everyone notice of what the outcome will be. A certificate of formation for a Texas nonprofit corporation is not an unnecessarily complicated and burdensome document. It is a fill-in-the-blank and check-box form that is publicly available.[70] The same is true of the form for amending a certificate of formation.[71] And the Business Organizations Code freely allows amendment of the certificate.[72] Plaintiffs assert that they filed such an amendment the same day they filed this suit, and Defendants assert they were in the process of doing the same, in conjunction with adopting new bylaws to correspond with the amendment, when Plaintiffs notified them of this suit.

¶28    Plaintiffs argue that the statute creates a "Catch 22" because filing the amended certificate of formation before enacting new bylaws strips the board of

---

[69] Plfs. MSJ at ¶¶ 45–46.

[70] The form is available on the Secretary of State's website, with instructions for use. *See Business and Nonprofit Forms*, TEX. SEC'Y OF STATE, https://www.sos.state.tx.us/corp/forms_boc.shtml.

[71] This form and accompanying instructions are also available on the Secretary of State website.

[72] TEX. BUS. ORGS. CODE § 3.051(a).

directors of power, such that it could not enact new bylaws to enable member management, while amending the bylaws first renders the bylaws inconsistent and thus void.[73] Plaintiffs argue that this "trap" can be avoided by interpreting the statute so that "it does not impose a necessary order of steps to transition." But the problem for plaintiffs is not any supposed order-of-steps requirement because no party asserts that the Temple amended (or even attempted to amend) the Certificate of Formation at any time before the date this lawsuit was filed.

¶29    Regardless, this supposed conundrum is imagined; there is no great difficulty in amending bylaws and the certificate of formation when the change to the bylaws affects one of the fundamental subject matters covered by the certificate.[74] First, amendments to a corporation's certificate of formation and bylaws can be, and often are, approved by the corporation's governing persons contemporaneously. Second, the Business Organizations Code authorizes corporations to file amendments to certificates of formation that will not go into effect immediately, allowing time to effectuate other necessary measures such as changes to the bylaws.[75] There is, in fact, a check box on the Certificate of

---

[73] Plfs. MSJ at ¶¶ 46–48.

[74] *Id.* at ¶ 46.

[75] TEX. BUS. ORGS. CODE §§ 3.056(a), 4.052(b).

18

Amendment form where the filing entity indicates when the amendment will be effective:

> **Effectiveness of Filing** (Select either A, B, or C.)
>
> A. ☐ This document becomes effective when the document is filed by the secretary of state.
> B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____
> C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: _____
> The following event or fact will cause the document to take effect in the manner described below:

[76]

¶30    To accomplish the stated goal of switching the Temple to a member-managed nonprofit corporation, the Temple's board of directors could have approved and filed new bylaws and an amended certificate of formation at the same time, or it could have approved and filed the certificate of formation with a future effective date first, then amended the bylaws. There may well be other means to accomplish this goal, but these two examples are sufficient to demonstrate that there is no "Catch 22."

**B.     Plaintiffs have not shown that either the church-autonomy doctrine or general principles of equity support their position.**

¶31    Plaintiffs argue that even if the Temple has not undertaken the legal steps necessary to become a member-managed nonprofit corporation governed by

---

[76] Certificate of Amendment, available at https://www.sos.state.tx.us/corp/forms_boc.shtml.

the 2025 Bylaws, the Court should declare it to be so by court order, bypassing the steps required by the legislature for all other business entities. To support this argument, Plaintiffs invoke the church-autonomy doctrine and unspecified principles of equity. But Plaintiffs have not shown that either theory supports their position here.

**1. Plaintiffs have not shown that the church-autonomy doctrine supports their position.**

¶32   Texas courts apply a "neutral principles methodology," under which they lack jurisdiction to decide, and "must defer to the decisions of appropriate ecclesiastical decision makers" with respect to, "questions of an ecclesiastical or inherently religious nature," but "apply neutral principles of law to non-ecclesiastical issues involving religious entities," including issues of corporate formation and governance, "in the same manner as they apply those principles to other entities and issues."[77] This case presents a non-ecclesiastical issue of corporate governance that can be decided by neutral application of Texas corporate law, such that the Court has jurisdiction.[78] Here, as in *Southern Methodist University v. South Central Jurisdictional Conference of the United Methodist Church*, the Temple "chose to establish [itself] as a nonprofit corporation subject to Texas

---

[77] *S. Methodist Univ. v. S. Cent. Jurisdictional Conf. of the United Methodist Church*, 716 S.W.3d 475, 482 (Tex. 2025) (quoting *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 605–06 (Tex. 2013)).

[78] *See, e.g.*, *S. Methodist Univ.*, 716 S.W.3d at 482; *Masterson*, 422 S.W.3d at 606.

corporations law," and Plaintiffs' "claims may be resolved by looking solely to Texas statutes and [the Temple's] articles of incorporation."[79] The Court thus applies the neutral-principles methodology, which "respects and enforces the manner in which religious entities and their adherents choose to structure their organizations and their property rights."[80]

¶33 Plaintiffs argue that the Court should exercise jurisdiction (at least so long as the Court agrees with them)[81] and hold that they prevail under the church-autonomy doctrine. Plaintiffs are correct that the United States and Texas

---

[79] *S. Methodist Univ.*, 716 S.W.3d at 482; *see also* n.4, *supra*.

[80] *Id.* at 483 (quoting *Masterson*, 422 S.W.3d at 606) (alterations omitted).

[81] Initially, all parties agreed that the Court has jurisdiction over this case. Second Am. Pet. at ¶ 16; Joint Proposed Scheduling Order at 1; *see also S. Methodist Univ.*, 716 S.W.3d at 483 ("[T]he Conference is the entity seeking relief from the courts, which of course may grant such relief only if they have jurisdiction over the dispute and the parties."). Now, even though all claims at issue are claims that Plaintiffs themselves brought in this Court and repeatedly pleaded the Court has jurisdiction over, Plaintiffs appear to argue the Court has jurisdiction only to rule in favor of Plaintiffs and lacks jurisdiction to decide the Plaintiffs are not entitled to prevail. Plfs. Resp. at 1, 6. While there may be circumstances in which the Court's jurisdiction is outcome-dependent, the Court concludes that this is not such a situation. Plaintiffs' argument seems to be that the Court can only decide who has control over legal, secular governance issues but not who has control over ecclesiastical decisions. The Court need not and does not decide who controls the Temple's ecclesiastical decisions in disposing of this case. Plaintiffs also cite several cases for the proposition that a court cannot tell a church who its members should be. Here too, the Court need not and does not decide who the Temple's members are or can be—only the legal procedure under the Business Organizations Code for converting the Temple from a board-managed nonprofit corporation with no members to a member-managed nonprofit corporation with members. Moreover, the Court notes that this opinion and the Business Organization Code relate only to corporate membership and do not attempt to regulate a religious organization's constituency, congregation, or other membership for ecclesiastic purposes.

21

Constitutions mandate robust protection of religious freedom.[82] But they fail to show how those principles support their position here.

¶34    Plaintiffs argue that because the Temple has a congregational, rather than hierarchical, religious structure, the Temple has chosen to be governed by majority control.[83] According to Plaintiffs, the following factors demonstrate that the Temple is congregational: "(1) the Temple is not affiliated with a parent organization; (2) there are no ascending order of ecclesiastical judicatories in which the Temple is subject to review and control; (3) the Temple is not subject to the jurisdiction of any higher religious constitution; (4) there is no parent church charter; (5) the repository of legal title resides with the Temple; and (6) there is no standardized body that licenses or ordains ministers."[84] Thus, Plaintiffs argue: "Since the Temple is a congregational religious organization, 'all ecclesiastical remedies rest within the congregation itself.'"[85]

¶35    All of this may be true, but the next steps of Plaintiffs' argument fall short. First, while all "ecclesiastical remedies" may rest with the congregation, the

---

[82] *See, e.g.*, U.S. CONST. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]"); TEX. CONST. art. I, § 6 ("No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion, and no preference shall ever be given by law to any religious society or mode of worship.").

[83] Plfs. MSJ at ¶¶ 27–30.

[84] *Id.* ¶ 27.

[85] *Id.* at ¶ 28 (quoting *Mangum v. Swearingen*, 565 S.W.2d 957, 958 (Tex. App.—San Antonio 1978, writ ref'd n.r.e.)).

parties' dispute is over what steps were necessary to convert the Temple from a board-managed corporation to a member-managed corporation—a non-ecclesiastical matter than can be decided by the application of neutral laws. Plaintiffs themselves admit in their petition: "Whether and how a corporation's directors or those entitled to control its affairs can change its articles of incorporation and bylaws are secular, not ecclesiastical, matters."[86]

¶36 Importantly, all parties in this case agree that the Temple's governance ultimately should be placed in the hands of its trustees.[87] The issue before the Court is simply whether the 2025 Bylaws accomplished that task or whether further action needed to be taken. Ultimately, the dispute before the Court is one of corporate management that does not hinder the Temple's self-governance, and the Court need not and does not resolve any ecclesiastical issues to decide it.[88]

¶37 Plaintiff argues that some provisions of the 2025 Bylaws give the trustees authority to make decisions that have the potential to touch on ecclesiastical matters, rather than matters of corporate governance. But Plaintiffs

---

[86] Second Am. Pet. at ¶ 69.

[87] *See, e.g.*, Plfs. MSJ at ¶¶ 7, 10, 29, 50; Defs. MSJ at 5.

[88] *See Masterson*, 422 S.W.3d at 608 (distinguishing between ecclesiastical issues like a bishop's determinations of which worshipers were loyal and constituted parish and secular issues like "whether the corporation's bylaws were complied with when the vote occurred"); *see also id.* at 609 ("Absent specific, lawful provisions in a corporation's articles of incorporation or bylaws otherwise, whether and how a corporation's directors or those entitled to control its affairs can change its articles of incorporation and bylaws are secular, not ecclesiastical, matters.").

23

have not asserted any claims regarding any ecclesiastical decision or shown any ripe controversy between the parties over any ecclesiastical matter.[89] The actual, ripe controversy shown by the pleadings is over whether the Temple's Certificate of Formation had to be amended before the members could elect a new board of directors and executive committee under the 2025 Bylaws.[90] "To be sure, 'courts must be careful not to intrude upon internal matters of church governance,'"[91] such that they "impermissibly opine on matters of church doctrine."[92] But the Court need not do so here to resolve the summary-judgment motions before it.

¶38　　Second, Plaintiffs do not seek to vest control of the Temple in all of its devotees, regular attendants, or even all devotees who paid a membership donation.[93] Instead, Plaintiffs seek to vest corporate control in the small segment of devotees who paid the highest ($20,000) membership fee and thus became trustees. Plaintiffs asserted at oral argument that these trustees, alone, constitute the Temple's "congregation." But the basis on which Plaintiffs rely to establish that the

---

[89] *See, e.g.*, Plfs. Resp. at 6–7, 9–10. For example, no party asks the Court to resolve any remaining dispute over candidate eligibility.

[90] *See generally*, Second Am. Pet.

[91] *S. Methodist Univ.*, 716 S.W.3d at 482 (quoting *Westbrook v. Penley*, 231 S.W.3d 389, 397 (Tex. 2007)).

[92] *Id.*; *see also* n.103 and accompanying text, *infra*.

[93] The parties agree that at least 10,000 individuals attend the Temple's for worship services and festivals each year and at least 5,000 individuals attend the Temple's prayer services and festivals each year. Defs. Resp. Exh. P-1 at 12.

Temple is congregational—facts tending to show that no higher authority controls the Temple or its property—do not also tend to establish that the Temple's congregation is only its biggest donors. The only basis Plaintiffs cite for their position that the trustees alone constitute the Temple's congregation is the 2025 Bylaws. But the 2025 Bylaws were adopted by the 2024 Board—the same body that later revoked them.[94] Moreover, the 2025 Bylaws do not say that the trustees constitute the Temple's entire congregation.[95] To the contrary, the 2025 Bylaws indicate that the trustees do *not* constitute the entire congregation by imposing on the trustees responsibility to "safeguard the temple's reputation and act in its best interest, avoiding conflicts of interest and *making decisions that benefit the entire congregation.*"[96]

¶39    Finally, the Temple had the same congregational structure in 2007 when it elected not to have members and to place corporate governance in the hands of a board of directors.[97] No party contends those original elections were invalid. It is not clear to the Court why it would be inherently inconsistent for the Temple to

---

[94] SF 12; JX 9. Throughout most of their MSJ, Plaintiffs assert that the 2024 Board adopted the 2025 Bylaws. *See* Plfs. MSJ at ¶¶ 2, 10, 11, 20, 29–31, 33, 41. But at one point Plaintiffs assert that "the Temple (by its Trustees, or congregation) ratified the [2025] Bylaws." Plfs. MSJ at ¶ 31. Plaintiffs cite no evidence in support of this proposition and have not pointed to any evidence that the Temple's congregation or its trustees (those of the congregation who pay the membership fee) ever took any vote on the 2025 Bylaws.

[95] JX 10.

[96] *Id.* at § 2.1(3).

[97] JX 1–2.

elect to have a congregational ecclesiastical structure and a board-managed corporate structure, which is exactly what the Temple did from 2007 through 2025. Nor is the Court aware of any requirement that the trustees must constitute the Temple's entire congregation to be made the Temple's managing members once the Certificate of Formation and bylaws are properly amended. The Temple is free to change its chosen corporate-governance structure, and the statutorily prescribed steps for doing so do not inhibit that choice. The Temple simply failed to file an amended certificate of formation when it enacted the 2025 Bylaws—an error that is readily remedied. Even Plaintiffs assert: "[a]n amended certificate of formation is a simple form that takes a few hours to file."[98]

¶40    Plaintiffs next argue that the 2025 Bylaws establish that it is the "will of the majority" that the overall governance of the Temple be vested in the trustees rather than its board of directors, and the Court cannot "second-guess" that will.[99] Again, the 2025 Bylaws were adopted by the same people who later revoked them: the 2024 Board.[100] It is not clear how these bylaws establish "the will of the majority." Regardless, as discussed above, whether the Temple should be managed by a board of directors or its trustees is not in dispute in this lawsuit; the only dispute

[98] Plfs. MSJ at ¶ 37.

[99] *Id.* at ¶ 29 (citation and brackets from original omitted, citing JX 10 at ¶ 2.1).

[100] SF 12; JX 9.

is over what legal steps must be taken to accomplish that goal and whether that goal was accomplished before this lawsuit. The Business Organizations Code answers that question and does not interfere with the Temple's ability to elect to be member managed. It was the Temple that elected to be board managed in the first place,[101] and the process for changing that election is both simple and neutral.[102]

¶41 The constitutions and laws of Texas and the United States unquestionably provide robust protection of religious freedom and a religious establishment's right to decide for itself, free from governmental interference, matters of faith, doctrine, and church governance.[103] There is simply no evidence of any impediment to those rights here.

### 2. Unspecified doctrines of equity do not support the Plaintiffs' position.

¶42 Plaintiffs assert that the 2024 Board could have, and should have, amended the Certificate of Formation sooner, and unfairly used its failure to do so

---

[101] JX 1, 2.

[102] *See* TEX. BUS. ORGS. CODE §§ 22.101–.108.

[103] *E.g.*, *In re Lubbock*, 624 S.W.3d 506, 513 (Tex. 2021) ("Churches have a fundamental right under the First Amendment to decide for themselves, free from state interference, matters of church governance as well as those of faith and doctrine."); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 737 (2020) ("The First Amendment protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.,* 344 U.S. 94, 116 (1952))); *see also S. Methodist Univ.*, 716 S.W.3d at 498–99 (Young, J., concurring) (describing this "broad prohibition against the 'government' *in toto*" as a principle that "does not merely confer rights, as important as they are; it also provides an absolute boundary dividing civil governmental power from a wholly different realm of sovereignty").

to revoke the 2025 Bylaws.[104] Plaintiffs argues that "[p]rinciples of equity prohibit Defendants from benefiting from their own fault," and therefore "the Temple asks that the Court, as a matter of equity, to declare the [2025] Bylaws as the valid, governing bylaws of the Temple."[105] But Plaintiffs never identify which equitable doctrine they are relying on, much less attempt to show how the evidence establishes the elements of any such doctrine.[106] Moreover, Plaintiffs provide no authority indicating that a court can rely on general principles of equity to override an express statutory mandate.

## C.      Plaintiffs have not carried their burden as summary-judgment movants.

¶43    In conclusion, Plaintiffs have not shown that, as a matter of law, they are entitled to summary judgment on their request for a declaration that the 2025 Bylaws are valid under Texas law. The Court therefore **DENIES** Plaintiffs' MSJ.

---

[104] Plfs. MSJ at ¶¶ 35–37.

[105] *Id.* at ¶ 40.

[106] Although Plaintiffs do not specify any particular equitable doctrine in their MSJ, they label this argument "equitable estoppel" in their response to Defendants' MSJ. Pltfs. Resp. at 13. "Equitable estoppel requires proof of five elements: [']( 1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations.[']" *PDT Holdings, Inc. v. City of Dallas*, 712 S.W.3d 597, 603 (Tex. 2025) (quoting *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 486 (Tex. 2017)). Plaintiffs make no effort to argue that these elements five elements are present here or identify summary-judgment evidence tending to support these elements.

¶44   As discussed above, Plaintiffs assert claims for declaratory judgment[107]

and promissory estoppel.[108] Defendants seeks summary judgment on both counts.[109]

## A.   Plaintiffs' declaratory-judgment action fails as a matter of law.

¶45   Plaintiffs seek declaratory judgment that:

(1)  the 2025 Bylaws are the Temple's current, governing bylaws;

(2)  any actions taken by the 2024 Board in contravention of the 2025 Bylaws after their ratification (on July 13, 2025) are invalid; and

(3)  any actions taken by the Temple related to its internal governance after ratification of the 2025 Bylaws are valid.[110]

¶46   The Court cannot issue these declaratory judgments because, as discussed above, the 2025 Bylaws are trumped by the Certificate of Formation with respect to whether the Temple's corporate governance rests in the hands of its board of directors or its members. The Plaintiffs' declaratory-judgment claims thus fail as a matter of law.

---

[107] Second Am. Pet. at ¶¶ 66–73.

[108] *Id.* at ¶¶ 74–77.

[109] Defendants' MSJ is directed only at the claims asserted by the individual Plaintiffs, as Defendants assert that the individual Plaintiffs lack authority to bring (the same) claims on behalf of the Temple and the Court lacks jurisdiction over claims purportedly asserted on behalf of the Temple. In conjunction with this opinion, the Court entered an order granting Defendants' Rule 12 Motion to Show Authority and striking the claims Plaintiffs assert on behalf of the Temple. Defendants' MSJ thus addresses the claims of all Plaintiffs remaining in the case.

[110] Second Am. Pet. at ¶¶ 69, 71, 73; *see also* SF 12–13; JX 9–10.

¶47 In their response to Defendants' MSJ, Plaintiffs raise many of the arguments addressed above. They also argue that fact issues prevent summary judgment on these claims.[111] But most of the "fact issues" Plaintiffs identify are not actually disputes over what occurred but rather what the legal effect of those occurrences are. In deciding the motions at issue here, the Court does not rely on any controverted facts; it relies only on the stipulated facts and facts established by uncontroverted evidence.

¶48 Plaintiffs also raise defensive theories, addressed below.

**1. Plaintiffs have not raised a fact issue on their equitable estoppel defense.**

¶49 Plaintiffs raise a defense they label "equitable estoppel," asserting essentially the same argument addressed above under general principles of equity.[112] Specifically, Plaintiffs contend that Defendants should have amended the certificate of formation when they adopted the 2025 Bylaws and promised—but failed—to do so. Based on this, they argue that "[e]quitable principles do not permit the Defendants to benefit from their own bad acts" and "[t]here is a fact issue whether equity allows Defendants to maintain their control due to their own failure to act."[113]

---

[111] Plfs. Resp. at 10–19.

[112] *See* "Plaintiffs' MSJ," Part B(2), *supra.*

[113] Plfs. Resp. at 13–14.

¶50 A party asserting estoppel bears the burden of proving the essential elements of the doctrine asserted.[114] To prevail on equitable estoppel, Plaintiffs must prove that (1) Defendants misrepresented or concealed material facts; (2) Defendants had actual or constructive knowledge of those facts; (3) Defendants intended Plaintiffs to act in reliance on their misrepresentation or concealment; (4) Plaintiffs did not have knowledge or means of obtaining knowledge of the true facts; and (5) Plaintiffs detrimentally relied on the representation or concealment.[115] Plaintiffs' summary-judgment response does not address these elements or attempt show that the summary-judgment evidence raises a fact issue on each of these elements. For example, Plaintiffs do not argue or identify evidence to show that, at the time of the Disputed Election, they did not know and could not have discovered that the Certificate of Formation had not been amended to select member management instead of board management. To the contrary, the Stipulated Facts and Joint Exhibits reflect that the Temple's devotees were informed of the Certificate of Formation problem on October 29, 2025, before the Disputed

---

[114] *Concord Oil Co. v. Alco Oil & Gas Corp.*, 387 S.W.2d 635, 639 (Tex. 1965).

[115] *See PDT Holdings*, 712 S.W.3d at 603; *Shields Ltd.*, 526 S.W.3d at 486; *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515–16 (Tex. 1998).

31

Election.[116] And certificates of formation are public records filed with the Secretary of State and available to the public.[117]

### 2. Plaintiffs have not raised a fact issue on waiver or ratification.

¶51     Next, Plaintiffs argue that from July 13 to October 27, 2025, "over three months[,] the Defendants repeatedly represented and acted as though the [2025] Bylaws were the governing bylaws, including initiating the November elections," and that "Defendants' words and acts create a fact issue of whether they waived any right to later challenge the bylaws that they themselves adopted, or alternatively ratified any defective acts by initially supporting those acts."[118]

¶52     As an initial matter, waiver and ratification are generally affirmative defenses or pleas in avoidance that must be pleaded by the party asserting them.[119] Plaintiffs have not pleaded either.[120]

---

[116] SF 19; JX 14.

[117] *See Copies and Certificates*, TEX. SEC'Y OF STATE, https://www.sos.state.tx.us/corp/copies.shtml.

[118] Plfs. Resp. at 14; *see also id.* at 15.

[119] *See* TEX. R. CIV. P. 94; *ConocoPhillips Co. v. Hahn*, 704 S.W.3d 515, 526 (Tex. 2024) ("[R]atification is a plea in avoidance and thus is an affirmative defense which must be pleaded." (quoting *Petroleum Anchor Equip., Inc. v. Tyra*, 419 S.W.2d 829, 834 (Tex. 1967) (alteration in original)); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 223 (Tex. 1992) (holding that, because plaintiff failed to plead waiver, it lost the right to argue that defendants waived their right to assert impairment of collateral defense); *Royal Typewriter Co. v. Vestal*, 572 S.W.2d 377, 378–79 (Tex. App.—Houston [14th Dist.] 1978, no writ) (holding that plaintiff was required to plead ratification in response to defendants' pleaded defenses). Defendants have pleaded revocation of the 2025 Bylaws. *See* First Am. Answer at ¶ 2.

[120] *See generally,* Second Am. Pet. Plaintiffs' live petition makes no reference to waiver at all. *Id.* While the petition references ratification, all such references are to the 2024 Board's original

¶53 Waiver is "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right."[121] To prevail on waiver, Plaintiffs must show that Defendants (1) held an existing right, (2) had knowledge of its existence, and (3) actually intended to relinquish the right or engaged in intentional conduct inconsistent with the right.[122] Even assuming this defense is applicable here and could be used to make the 2025 Bylaws control over the Certificate of Formation in contravention of Section 22.102 of the Business Organization Code, Plaintiffs' summary-judgment response does not identify these elements or attempt to show how the evidence raises a fact issue on all such elements. Nor does Plaintiffs' response explain how complying with the 2025 Bylaws before discovering that they conflicted with the Certificate of Formation demonstrates an intent to relinquish the right to revoke the 2025 Bylaws after learning of the conflict.

¶54 "Ratification is [1] the adoption or confirmation by a person [2] with knowledge of all material facts [3] of a prior act [4] which did not then legally bind

---

adoption of the 2025 Bylaws in July 2025, which the parties refer to as "ratification" of them. *See id.* at ¶¶ 43–45, 56, 58, 61, 68, 71, 73, 75.

[121] *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) (quoting *Sun Exploration & Prod. Co. v. Benton,* 728 S.W.2d 35, 37 (Tex. 1987), and citing *U.S. Fid. & Guar. Co. v. Bimco Iron & Metal Corp.,* 464 S.W.2d 353, 357 (Tex. 1971)).

[122] *See Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008).

him and [5] which he had the right to repudiate."[123] Again, even assuming this defense is applicable here, Plaintiffs do not address these elements or attempt to show that the evidence raises a fact issue on each of them. For example, Plaintiffs do not attempt to identify evidence that the 2024 Board was aware of the conflict between the 2025 Bylaws and the Certificate of Formation before Sloan discovered it and informed the board (and shortly thereafter, the rest of the Temple) of the issue.

¶55   Additionally, the Business Organizations Code provides a procedure for nonprofit corporations to ratify "a defective corporate act" that would otherwise be "ineffective, void, or voidable solely as a result of a failure of authorization."[124] No party pleaded that this procedure was satisfied here, nor are these statutory provisions addressed in the parties' summary-judgment briefing.

¶56   For the reasons above, the Court **GRANTS** Defendants' request for summary-judgment on Plaintiffs' declaratory-judgment claims.

## B.   Plaintiffs' promissory-estoppel claim fails as a matter of law.

¶57   In support of their claim for promissory estoppel, Plaintiffs allege that: the 2024 Board repeatedly "promised to file an amended certificate of formation to change the Temple to a member-based organization, hold elections, and elect a new Board of Directors, all in accordance with the [2025] Bylaws," and the Temple's

---

[123] *BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 196 (Tex. 2021).

[124] TEX. BUS. ORGS. CODE § 22.502(a); *see also id.* §§ 22.502(b)(2)–(3), 22.503–.512.

34

members substantially relied on that promise to their detriment.[125] Defendants argue that this claim fails as a matter of law because Plaintiffs "have disclaimed any right to monetary relief or damages, which is the exclusive remedy available for [promissory estoppel]."[126] Plaintiffs respond that the authorities Defendants rely on address what kind of monetary damages are available for a promissory-estoppel claim—reliance versus expectation—not whether a party must have monetary damages to pursue such a claim.[127] They concede that they do not seek monetary damages, but they argue that "courts are permitted to grant injunctive relief based on promissory estoppel claims"[128] and point out that they seek injunctive relief.[129] The Court holds that Plaintiffs' promissory-estoppel claim fails as a matter of law because Plaintiffs do not seek damages and the injunctive relief they seek is not the kind of restorative relief available for that claim.

¶58   "Promissory estoppel generally is a defensive doctrine in that it estops a promisor from denying the enforceability of the promise."[130] It is quasi-contractual

---

[125] Second Am. Pet. at ¶¶ 74–77.

[126] Defs. MSJ at 18–19.

[127] Plfs. Resp. at 19.

[128] *Id.* (citing *Sw. Water Servs., Inc. v. Cope*, 531 S.W.2d 873, 877 (Tex. App.—Fort Worth 1975, writ ref'd n.r.e.)).

[129] *Id.*

[130] *Trammell Crow Co. No. 60 v. Harkinson*, 944 S.W.2d 631, 636 (Tex. 1997) (citing *Wheeler v. White,* 398 S.W.2d 93, 96 (Tex. 1965)); *see also Moore Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934, 936 (Tex. 1972).

in nature and may be raised when the promise is unenforceable under a strict contract theory.[131] Depending on the court and the context, Texas courts of appeals have sometimes recognized promissory estoppel as a valid basis for an affirmative claim and sometimes limited promissory estoppel to defensive uses.[132] For purposes of this opinion, the Court assumes (without deciding) promissory estoppel can be asserted as an affirmative claim here.

¶59   The Court agrees with Plaintiffs that Defendants' authority establishes that the appropriate damages for promissory estoppel are reliance damages rather than expectation damages—not that damages are the exclusive remedy for

---

[131] *See, e.g.*, *Sun Oil Co. (Del.) v. Maeley*, 626 S.W.2d 726, 734 (Tex. 1981); *Wheeler*, 398 S.W.2d at 96–97.

[132] *See, e.g.*, *Lotito v. Knife River Corp.-S.*, 391 S.W.3d 226, 227 (Tex. App.—Waco 2012, no pet.) (discussing precedent and holding that promissory estoppel is basis for affirmative claim in bid construction cases but not employment cases); *Stanley v. CitiFinancial Mortg. Co.*, 121 S.W.3d 811, 820 (Tex. App.—Beaumont 2003, pet. denied) ("Appellants, in this case, seek to use the doctrine of promissory estoppel as an affirmative basis for relief. While recognizing there is authority to the contrary, this Court has held, and holds in this case, that promissory estoppel is defensive only, and cannot constitute a basis for affirmative relief." (footnote omitted)); *Robbins v. Payne*, 55 S.W.3d 740, 747 (Tex. App.—Amarillo 2001, pet. denied) ("Promissory estoppel is a defensive doctrine which permits one who has relied on a promise to prevent an attack on the enforceability of the promise. The doctrine does not establish a cause of action or, in the words of our supreme court, does 'not operate to create liability where it does not otherwise exist.'" (citations omitted, quoting *Hruska v. First State Bank of Deanville*, 747 S.W.2d 783, 785 (Tex. 1988))); *Jefferson Cnty. Drainage Dist. No. 6 v. Lower Neches Valley Auth.*, 876 S.W.2d 940, 953 (Tex. App.—Beaumont 1994, writ denied) ("We interpret the recent Texas Supreme Court opinions on the doctrine of estoppel as denying estoppel as a basis for affirmative relief."); *see also Hruska*, 747 S.W.2d at 785 ("The function of waiver or estoppel is to preserve rights, not to create independent causes of action. Waiver and estoppel are defensive in nature and operate to prevent the loss of existing rights. They do not operate to create liability where it does not otherwise exist." (citations omitted)).

promissory estoppel.[133] Generally, the elements of promissory estoppel are: "(1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment."[134] Monetary damages are not an element—perhaps because of the doctrine's primarily defensive nature. The Court thus agrees with Plaintiffs that the absence of damages is not, alone, fatal to their promissory estoppel claim; at least in theory, their request for an injunctive relief could be an alternative, equitable remedy available on that claim.

¶60    However, Defendants' authorities also reflect that the relief available for promissory estoppel, whether asserted defensively or as an affirmative claim, is for the reliance injury rather than the expectation injury—i.e., the remedy is to put the claimant back in the position the claimant was in before relying on the defendant's promise, not the position the claimant expected to be in if the defendant had fulfilled the promise.[135] These cases discuss this concept in the context of

---

[133] *See Sun Oil*, 626 S.W.2d at 734; *Thomas Oilfield Servs., LLC v. Clark*, No. 12-18-00344-CV, 2019 WL 3024765, at *2 (Tex. App.—Tyler July 10, 2019, no pet.); *Range v. Calvary Christian Fellowship*, 530 S.W.3d 818, 831 (Tex. App.—Houston [14th Dist.] 2017, pet. denied); *Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 794 (Tex. App.—Dallas 2007, no pet.).

[134] *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 90.

[135] *See, e.g.*, *Fretz Const. Co. v. S. Nat. Bank of Houston*, 626 S.W.2d 478, 483 (Tex. 1981) ("Damages recoverable in a case of promissory estoppel are not the profit that the promisee expected, but only the amount necessary to restore him to the position he would have been in had he not acted in reliance on the promise.'); *Wheeler*, 398 S.W.2d at 97 ("Where the promisee has failed to bind the promisor to a legally sufficient contract, but where the promisee has acted in reliance upon a promise to his detriment, the promisee is to be allowed to recover no more than reliance damages measured by the detriment sustained. Since the promisee in such cases is partially responsible for his failure to bind the promisor to a legally sufficient contract, it is reasonable to

damages, because that was the remedy sought there (and in most such cases), but the underlying principle is equally applicable to equitable relief: "all that is required to achieve justice is to put the promisee in the position he would have been in had he not acted in reliance upon the promise."[136] The injunctive relief Plaintiffs seek here does not fit the bill.

¶61 Plaintiffs seek an injunction that "orders Defendants to cease any acts touching upon the management of the Temple, vacate the Temple's principal office, and turnover all books, records, and other effects of the Temple to the newly elected board of directors."[137] This injunctive relief is plainly designed to effectuate the declaratory judgments Plaintiffs seek,[138] and Plaintiffs sought it before they even pleaded a promissory-estoppel claim. It is likely unavailable given the Court's substantive rulings on the Plaintiffs' declaratory-judgment claims. But even if the

---

conclude that all that is required to achieve justice is to put the promisee in the position he would have been in had he not acted in reliance upon the promise."); *Bechtel Corp. v. CITGO Prods. Pipeline Co.*, 271 S.W.3d 898, 928 (Tex. App.—Austin 2008, no pet.) ("CITGO's damages are not reimbursement for any amounts it expended in reliance on the promises, but compensation for consequential losses CITGO claimed it incurred when appellants failed to perform their promises. Such damages are in the nature of expectancy damages: they place CITGO in the position it claims it would have been had the promises been kept. Such damages are not recoverable through promissory estoppel.").

[136] *Wheeler*, 398 S.W.2d at 97.

[137] Second Am. Pet. at ¶ 24.

[138] Indeed, the injunctive-relief section of Plaintiffs' operative petition is titled "Request for *Ancillary* Injunctive Relief" (emphasis added) and specifically bases the request for an injunction on the assertion that the Plaintiff Board "manages the Temple" and needs the requested relief to carry out that role. *See* Second Am. Pet. ¶¶ 7–8, 10, 65, 79.

requested injunction were otherwise suitable for Plaintiffs' promissory-estoppel claim, it would not be an appropriate remedy for that claim because it does not seek the kind of relief available under a promissory-estoppel theory—i.e., it does not seek to put Plaintiffs in the position they were in before they relied on Defendants' alleged promises.

¶62 For these reasons, the Court **GRANTS** Defendants' request for summary judgment on Plaintiffs' claim for promissory estoppel.

## Conclusion

¶63 The Court **DENIES** Plaintiffs' MSJ and **GRANTS** Defendants' MSJ. This is not a final judgment, as Defendants' claim for attorney's fees under the Declaratory Judgment Act remains pending. Defendants must file any motion for attorney's fees by **July 24, 2026**, and Plaintiffs must file any response by **July 31, 2026**. Any party may request an oral hearing on any motion for attorney's fees by complying with Third Division Court Procedure VI(C) by **July 27, 2026**; otherwise, it will be submitted to the Court on written submission at **9 a.m.** on **August 3, 2026**.

Date signed: July 14, 2026

_____
Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division